UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANETTE MACDONALD, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| KAKU ASSOCIATES, INC. and | ) |
| DICK S. KAKU, | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 04-11218-RCL

## DEFENDANT DICK KAKU'S MOTION TO LIMIT DISCOVERY

The only remaining defendant in this case, Dick S. Kaku ("Kaku"), who has only one claim pending against him (intentional infliction of emotional distress), hereby moves to limit discovery to two issues: (1) how many telephone calls he placed to plaintiff in Massachusetts between August 22, 2002 and May 21, 2004; and (2) the nature and substance of those calls (*i.e.*, information from which a fact-finder can determine whether the calls were harassing, and, if so, whether they rose to the level of "extreme and outrageous" conduct).

### PROCEDURAL BACKGROUND

In her Complaint, plaintiff Nanette Macdonald ("Macdonald") asserted ten counts against Kaku and eleven counts against his company, Kaku Associates, Inc. On June 30, 2004, the defendants filed a motion to dismiss the Complaint in its entirety for lack of personal jurisdiction or, in the alternative, for failure to state a claim. Macdonald opposed the motion. The Court heard the motion on December 13, 2004. At the hearing the Court ruled from the bench,

dismissing all of the claims against Kaku Associates, and all of the claims against Kaku except for intentional infliction of emotional distress.[1]

## FACTUAL ALLEGATIONS

Except for the telephone calls allegedly made by Kaku to Macdonald after Macdonald moved to Massachusetts on August 22, 2002, all of the events alleged in the Complaint occurred outside Massachusetts when both parties lived outside Massachusetts.

Specifically, Macdonald has alleged that while she was living in Hawaii and having an affair with Kaku, a California resident, he hired her to set up an Hawaii office for his California company, Kaku Associates. Later, the affair allegedly became non-consensual and Kaku allegedly engaged in a series of wrongful actions including sexual harassment, fraudulent promise of employment, and wrongful termination of employment. All of those alleged incidents occurred in Hawaii and/or California while the parties were living in those two states.[2]

---

[1] The Court dismissed the following claims brought against both defendants: sexual harassment in violation of Title VII, MGL ch. 151B, and MGL ch. 214, § 1C (Counts I-III); violation of the Massachusetts Civil Rights Act, MGL ch. 12, § 11(I) (Count IV); violation of the Massachusetts Equal Rights Act, MGL ch. 93, § 102 (Count V); fraud (Count VI); breach of contract and breach of the implied covenant of good faith and fair dealing (Count VII); assault and battery (Count VIII); and negligent infliction of emotional distress (Count X). The Court also dismissed the claim for respondeat superior (Count XI), which had been brought against Kaku Associates only, and it dismissed the claim for intentional infliction of emotional distress (Count IX) as against Kaku Associates.

[2] Among other things, Macdonald has alleged that in April 2001, Kaku threatened to send every person she knew a very embarrassing letter from one of her former attorneys, with whom she also had a sexual affair. Complaint ¶ 74. The letter (Exhibit A) outlined the lawyer's affair with Macdonald; Macdonald's admission that she was never employed by Kaku Associates; the fact that her "employment" with Kaku Associates was a ruse that she used to explain to her husband the money she received from Kaku and the trips she took with him; the fact that she disliked Kaku but continued to have sex with him simply because she enjoyed receiving his gifts of money and jewelry; her boasts of manipulating Kaku into giving her even more money and gifts; the ways she deceived both her husband and Kaku; her admission that she considered herself a prostitute; the voluminous nature of the one-night stands and other sexual relationships she had with many men during the course of her marriage and simultaneous affair with Kaku; the fact that she was "substantially dependent on Mr. Kaku to support [her] extravagant lifestyle"; the assistance Macdonald received from the letter's author in retaining four different lawyers for the purpose of threatening legal action against Kaku in order to extort a financial settlement from him; and the ways Macdonald had persuaded the author to lend her over $25,000 in exchange for a promise to repay him from the settlement she intended to wangle from Kaku.

Chronologically, the last of those events occurred in May 17-21, 2001, when Kaku allegedly placed some harassing telephone calls to Macdonald in Hawaii. Complaint, ¶¶ 78-79.

Macdonald has not alleged that Kaku did anything wrongful between May 21, 2001 and August 22, 2002, when Macdonald moved to Massachusetts. See id. ¶¶ 84-87.

Thereafter, Kaku is alleged to have engaged in only one type of wrongful action. Specifically, between Macdonald's move to Massachusetts on August 22, 2002 and her filing of this lawsuit on May 21, 2004, Kaku supposedly made more than 60 harassing telephone calls to Macdonald. Id. ¶ 89. Macdonald later contradicted this allegation in an affidavit in which she admitted he might have called her only 50 times. See Macdonald Aff. (attached to Plaintiff's Opp. to Defs.' Mot. to Dismiss, filed July 21, 2004), ¶ 2 (alleging Kaku called her between 50 and 100 times). In her affidavit Macdonald did not explain what Kaku said to make the alleged calls harassing. Instead, she admitted that many were merely hang-up calls, and also that the only way she identified some of the calls as supposedly coming from Kaku is that she heard "noises like those heard when driving" in the background. Id. ¶ 3.

Kaku has submitted an affidavit stating that after Macdonald moved to Massachusetts, he placed friendly telephone calls to her approximately 22 times, and, further, that he has never harassed Macdonald. Kaku Aff. (attached to Memo. of Law in Support of Defs.' Mot. to Dismiss, filed June 30, 2004), ¶¶ 12-13.

## ARGUMENT

Discovery in this case should be limited to the three years immediately preceding the date Macdonald filed her Complaint, i.e., May 21, 2001 - May 21, 2004. That is so because, even in the best case scenario for Macdonald, the statute of limitations on her sole remaining claim is three years. See Cal. Civ. Code § 335.1 (two-year statute of limitations for intentional infliction

3

claims); Haw. Rev. Stat. § 657-7 (same); Linville v. Hawaii, 874 F. Supp. 1095, 1104 (D. Haw.

1994) (same); MGL ch. 260 § 2A (three-year statute of limitations for intentional infliction

claims); Donovan v. Gardner, 50 Mass. App. Ct. 595, 599 n.8 (2000) (same).

During the three years immediately preceding the date Macdonald filed her Complaint,

Kaku is not alleged to have committed any wrongful acts other than making harassing telephone

calls to Macdonald in Massachusetts between August 22, 2002 and May 21, 2004. Macdonald

claims that the calls constituted intentional infliction of emotional distress – *i.e.*, they rose to the

level of "extreme and outrageous" conduct that was "beyond all possible bounds of decency" and

"utterly intolerable in a civilized community." Beecy v. Pucciarelli, 387 Mass. 589, 596 (1982)

(quoting Agis v. Howard Johnson Co., 371 Mass. 140, 145 (1976)).

Given the very limited nature of the sole remaining claim, discovery should be restricted

to the time period August 22, 2002 - May 21, 2004, and should be limited to the issue of how

many telephone calls Kaku placed to Macdonald during that period, and the nature and substance

of those calls. To the extent the intentional infliction claim against Kaku is based on alleged

events that occurred before May 21, 2001, the claim is not only time-barred, but there is also a

lack of personal jurisdiction because all of those alleged events took place outside Massachusetts

when both parties lived outside Massachusetts. Indeed, the Court acknowledged the personal

jurisdiction limitation when it ruled from the bench that the only reason the intentional infliction

claim against Kaku survived was that a Massachusetts court would have personal jurisdiction to

find Kaku liable for directing tortious phone calls into the Commonwealth.

In accordance with Rule 26 and the Court's Notice of Scheduling Conference, counsel for

the parties spoke by telephone on January 10, 2005. In that conversation, Macdonald's counsel,

Lester Riordan, agreed with Kaku's counsel that the only issue left in this case is the telephone

calls Kaku allegedly placed to Macdonald after she moved to Massachusetts. However, Mr.
Riordan refused to agree to limit discovery to that issue. Instead, he asserted that Macdonald
should be able to discover facts relating to any and all of the following issues that preceded
Macdonald's move to Massachusetts:

- The length of the parties' sexual relationship (which both parties agree ended
  before Macdonald moved to Massachusetts);

- The "manner in which the relationship was conducted";

- Kaku's allegedly "controlling" nature;

- Kaku's alleged "harassment of other women";

- How Kaku "pays his mistresses";

- What hotels the parties stayed in and how Kaku paid for them;

- The basis for the 1099 tax forms issued by Kaku Associates to Macdonald in 2001
  and 2002 for work allegedly performed by Macdonald as an independent
  contractor before she moved to Massachusetts;

- Whether Kaku Associates paid Macdonald all of the sums reflected in the 1099
  forms;

- Whether Kaku Associates deducted business expenses for the payments to
  Macdonald reflected on the 1099 forms, and, if so, whether such deductions were
  improper; and

- Whether Kaku and/or Kaku Associates committed tax fraud.[3]

---

[3] Mr. Riordan also threatened to report Kaku and Kaku Associates to the IRS. To the extent he has threatened criminal action, he has violated Massachusetts Rule of Professional Conduct 3.4(h), which states that a lawyer may not "threaten to present criminal or disciplinary charges solely to obtain an advantage in a private civil matter."

Mr. Riordan also stated that he would seek discovery into Macdonald's alleged employment relationship with Kaku Associates, although he would not need to spend "an inordinate amount of time" on that issue. Mr. Riordan has taken this position on behalf of his client even though Macdonald has conceded that her alleged employment occurred outside Massachusetts and it ended outside the three-year statute of limitations, and even though the Court has dismissed all of the employment-related claims.

None of the above issues on which Macdonald seeks to pursue discovery is relevant or even reasonably calculated to lead to discovery of admissible evidence. To the extent the nature of Kaku's calls to Macdonald can be understood only with reference to the parties' past sexual relationship, discovery on the details of that relationship is not necessary; it is sufficient that both parties concede they had an affair and it ended before Macdonald moved to Massachusetts.[4] Nor does any tax-related issue have anything to do with the intentional infliction claim. Indeed, the 1099's were issued for work allegedly performed by Macdonald before she moved to Massachusetts and, therefore, before the allegedly harassing calls even began.

It is clear that Macdonald's sole reason for seeking discovery on the above issues is to harass Kaku and intimidate him into giving her a financial settlement. It is ironic that Macdonald is engaging in the very wrongdoing of which she has accused Kaku: harassment.

### CONCLUSION

For the foregoing reasons, Kaku respectfully requests that the Court limit discovery in this action to two issues: (1) the number of telephone calls made by Kaku to Macdonald in Massachusetts between August 22, 2002 and May 21, 2004; and (2) the nature and substance of those calls.

---

[4] Macdonald claims the affair ended on or about June 5, 2000 when she retained an attorney and sent Kaku a letter telling him to stop his sexual advances. See Complaint ¶¶ 39-40. She moved to Massachusetts more than two years later. See id. ¶ 87.

6

Respectfully submitted,

DICK S. KAKU

By his attorneys,

Christine J. Wichers (BBO# 631857)
Lisa M. Gaulin (BBO# 654655)
CHOATE, HALL & STEWART
53 State Street
Boston, MA 02109
617-248-5000

Dated: January 11, 2005

I HEREBY CERTIFY THAT A TRUE COPY OF
THE ABOVE DOCUMENT WAS SERVED
UPON THE ATTORNEY OF RECORD FOR
EACH OTHER PARTY BY MAIL/HAND ON:
1/11/05
CJW

7

LAW OFFICES

**JERALD B. SERVISS**

SUITE 355

11911 SAN VICENTE BOULEVARD

LOS ANGELES, CA 90049

OF COUNSEL:

BONAPARTE & MIYAMOTO
LOS ANGELES, CA

POLATSEK & SCLAFANI
FT. LAUDERDALE, FL

TELEPHONE: 310-472-6250
FACSIMILE: 310-471-1686
E-MAIL: SERVISS@IX.NETCOM.COM

April 6, 2001

Ms. Nanette Macdonald
P.O. Box 314
Honolulu, HI 96809

Dear Nan:

I am in receipt of your letter of April 2, 2001 and your progress payment of $100. Quite frankly I am disappointed and insulted at your purported effort to resolve the issue of the sum which you acknowledge is owed to me.

The facts and circumstances which give rise to your indebtedness are set forth as follows. We first met towards the end of March 2000, in the bar at the Peninsula Hotel in Los Angeles. We spent the night together talking and eventually ended the evening in your room where a brief sexual encounter ensued. During the course of the evening you told me that you were married and that you had been engaged in an adulterous affair with Mr. Dick Kaku which had transpired for over 13-14 years. You further advised me that you were "employed" by Mr. Kaku's firm, "Kaku Associates," basically as a device to "cover" your affair with Mr. Kaku and your frequent trips to Los Angeles to spend time with him. You also advised that Mr. Kaku had acquired an office in Honolulu, but that your duties with respect to his firm were virtually nonexistent, and that the entire arrangement was a device to enable Mr. Kaku to channel money to you while deducting your "salary" as a business expense, and further to keep your husband ignorant of the true nature of your relationship with Mr. Kaku and "Kaku Associates." I departed your room on that first evening at approximately 3:30 am.

The following morning you left a message on my office voice mail, inviting me to accompany you to Las Vegas. I met you in Las Vegas on March 30, 2000, and we spent the next 24 hours together during which you expounded on the story you had told me the night before. You told me that you basically held Mr. Kaku in contempt, but that you had grown accustomed to the money which you derived from your relationship, in both "salary" and other perks including jewelry, travel, expensive designer clothes, 401K contributions, etc. You also advised me that you secreted many of the jewelry and clothing items from your husband, and that you were masterful at manipulating Mr. Kaku to increase the bounty from your relationship. As our relationship developed you related numerous stories about your disdain for and manipulation of Mr. Kaku, the deception you practiced on your husband and your general disgust with the current state of your life. At one point you said that you viewed yourself as a "prostitute" with respect to

LAW OFFICES
JERALD B. SERVISS

Ms, Nanette Macdonald
April 6, 2001
page 2

your relationship with Mr. Kaku, inasmuch as you had no feelings towards him and resented his "controlling" behavior towards you. You also told me about countless numbers of sexual liaisons you had during the past 3-4 years while visiting Mr. Kaku in Los Angeles. You advised that after Mr. Kaku left you, typically in the early evening to return home to his wife, you would wander into the bar at the Peninsula and "pick up" men. You told me that you at one time had an ongoing sexual relationship with a bartender at the Peninsula, and that your sexual encounters in Los Angeles were so numerous that you could not remember all of them. You told me that typically, you would ask your partner for the evening to leave your room at the Peninsula in the early morning hours, allowing enough time to have the hotel's maid service clean the room before Mr. Kaku arrived in the morning. Your exploits at the Peninsula were apparently quite well known to the hotel staff and upon inquiry were confirmed to me by several employees. You further told me that your relationship with Mr. Kaku made you physically ill at times, and that you dreaded his arrival in the morning, owing to the fact that you were obliged to have sexual relations with him (which you found unsatisfying) and that you were "hung over" and worn out from your sexual escapades of the night before. You also told me about several excesses, including sleeping with three different men on the same night

Following our trip to Las Vegas, we began a "relationship" within a "relationship" within an adulterous affair. I spoke to you on the phone frequently, sometimes as often as 6-7 times a day, and you would advise me when you were coming to Los Angeles, where I would meet you following your rendevous' with Mr. Kaku. You suggested at one point that following one such trip to Los Angeles I accompany you home to Honolulu- which I did on May 4, 2000. At that time we spent six days together and you would visit me at the Halekulani Hotel every day. On several occasions we had dinner with your daughter. All during this time our personal relationship grew more intense (or so I was led to believe) and you continuously addressed the issue of how you were going to get out of your relationship with Mr. Kaku and concurrently leave your marriage. You frequently expressed discontent with the life you were leading and your frustration with both Mr. Kaku and your husband. You also elicited my help on countless occasions to "...help [you] out of this mess." You frequently told me that the biggest stumbling block for you was money, since you were substntially dependent on Mr. Kaku to support your extravagant lifestyle. After giving the matter some thought, I suggested that there may be several colorable causes of action which might legitimately lie against "Kaku Associates." At your request, I contacted a labor lawyer, Ms. Nancy Bornn, who we visited together in Los Angeles in May 2000. Although I accompanied you during this meeting, both you and Ms. Bornn asserted that I did not stand in a fiduciary capacity with respect to you as your attorney, and that the attorney client privilege was inapplicable to any admission made by you in my presence. This is a position that you continuously asserted, notwithstanding my suggestion later on that I file a formal notice of appearance as your attorney so that the privilege would apply. You insisted that I remain "invisible" with respect to the entire matter and that I not be involved in it as your attorney in any way. Ms. Bornn subsequently referred you to David Simons, Esq. in Honolulu. At a meeting which I attended with you in Mr. Simons' office in June 2000, potential causes of

LAW OFFICES
JERALD B. SERVISS

Ms, Nanette Macdonald
April 6, 2001
page 3

action were again discussed with respect to "Kaku Associates" and Mr. Kaku individually.
During this meeting you again referred to yourself as a "prostitute." Mr. Simons requested a
retainer in the amount of $1,500 which you requested that I advance. You told me that you
would repay this amount out of your settlement with Mr. Kaku. I wrote you a check for this
amount and a demand letter was prepared for delivery to Mr. Kaku.

　　　　Shortly after this meeting you advised me that you had broken off your
relationship with Mr. Kaku. From June 2000 to December 2000 we proceeded to visit each other
alternatively in Los Angeles and Honolulu. During this time you advised me that Mr. Kaku
made repeated attempts to resume his relationship with you but that you rebuffed his efforts to do
so. You also advised that during this period you continued to draw your "salary" from "Kaku
Associates." On July 25, 2000, you arrived at the Peninsula Hotel in Los Angeles accompanied
by Mr. Kaku. Upon discovering this fact, I spoke with you several times to determine why you
had decided to resume your affair with him. You told me that the day before your arrival in Los
Angeles (a statement which you subsequently admitted was a lie) Mr. Kaku threatened to expose
you to your husband, and that he would vigorously defend any action brought by you against him.
In fact, you had dismissed Mr. Simons as your attorney several weeks earlier, and received a
refund of a substantial portion of the $1,500 retainer which I loaned you. On July 27, 2000, you
called me and asked me to meet you at the Los Angeles International Airport. You were on your
way home to Honolulu and indicated that you were in fact going to proceed with your action
against "Kaku Associates," that in order to do so you were obligated to move out of your house
to avoid any unpleasantness with your husband, that you had located an apartment in Honolulu
and that you needed $3,000 for the security deposit and the first month's rent. You asked me to
advance that sum, which I did, and advised me that it would be repaid to me out of the settlement
you received from "Kaku Associates." We subsequently resumed our relationship, again visiting
each other at least twice each month, alternatively in Los Angeles and Honolulu.

　　　　In approximately August 2000, you advised that Mr. Kaku had terminated your
severance payments from "Kaku Associates," despite an agreement which had been reached
between you and the firm earlier. At your request, in October 2000, I arranged a meeting for you
to visit Angela Sousa, Esq. in Los Angeles for the purpose of assessing your potential claims
against "Kaku Associates" and Mr. Kaku. Ms. Sousa again advised you that you were waiving
attorney client privilege if I participated in your discussions with her concerning this matter, and
you once again agreed to continue the meeting in my presence and again insisted that I not be
formally or informally acknowledged as your attorney. Ms. Sousa prepared and delivered to Mr.
Kaku yet another demand letter, wherein several causes of action were set forth, including
solicitation of illegal campaign contributions. During this meeting you acknowledged that you
had acted as a "front" for Mr. Kaku with respect to other illegal campaign contributions in
Hawaii in years past. You further advised that despite requesting $3,000 from me for your
apartment, you had earlier received the same sum, for the same purported purpose, from Mr.
Kaku. Subsequently, a response was received from Mr. Kaku's attorney denying any and all

Ms, Nanette Macdonald
April 6, 2001
page 4

liability, and again at your request I located a fourth attorney in Honolulu, Mr. Ronald Au, for the purpose of assessing your potential claims against "Kaku Associates." I never attended any meetings with you and Mr. Au, nor did I ever meet with Mr. Au at all. Moreover, you advised me that the matter was to be kept strictly confidential between you and Mr. Au and as a consequence, I am unaware what, if any, legal proceedings were commenced with respect to this matter.

During the period July 2000 until February 2001 I advanced approximately $25,000 to $30,000 to you for personal expenses, including rent, car payments, children's tuition, etc. (exclusive of your travel and hotel expenses to Los Angeles, gifts, etc.). I note that you never moved into the apartment (located at 425 South Street, #603, Honolulu, HI 96913) despite your repeated assertions that you were preparing to do so. In fact you renewed the lease for an additional six months in January 2001 and approximately six weeks later removed all of your personal belongings and sublet to another tenant. Throughout this period you continuously asserted that these sums would be repaid to me upon the receipt of your "settlement" from the Kaku matter and I relied upon this representation which seemed reasonable to me at the time. You later advised me, in mid January 2001, that you dismissed Mr. Au and did not proceed to litigate any of the applicable claims.

Towards the early part of February (after I had paid the sum of $1,8000 for your February rent payment) you informed me that you had resumed your personal and sexual relationship with Mr. Kaku. You told me that this occurred towards the end of January 2001. You also indicated that you were again traveling to Los Angeles to visit him, that you would visit him when he traveled to Honolulu and that your "employment status" with "Kaku Associates" had been restored , however the exact nature of such "employment" relationship is unknown to me. Following a telephone conversation with you, I informed you that I was willing to accept the sum of $6,300 in full satisfaction of all sums which I loaned to you. This agreement was later memorialized in a promissory note executed by you on February 21, 2001. You drafted the note which recites a maturity date of August 30, 2001, however I never agreed to such date (as you have confirmed in your letter to me dated April 2, 2001) and view the note as a "demand" note. In fact this was confirmed by you several times during the two days we recently spent together at the Halekulani Hotel in Honolulu on March 5 and 6, 2001. Thus far I have received payments in the aggregate amount of $4,600. The last payment of $100 was received by me on April 5, 2001. I am astonished and appalled by your attitude concerning this matter, particularly in view of the fact that I agreed to forebear collection of over $20,000. I also have no confidence that you will abide by any agreement with respect to this matter (including making "progress" payments to extinguish the principal) since you have demonstrated to me on numerous occasions that you are a master of deceit, and further your admission to me during our recent visit in March  that your renewed relationship with Mr. Kaku is merely a ploy to secure additional "perks." I therefore make formal demand for the full balance due of $1,700, to be received in my office on or before April 25, 2001. Your failure to make the requested payment will result in legal action being

LAW OFFICES
**JERALD B. SERVISS**

Ms, Nanette Macdonald
April 6, 2001
page 5

taken against you as appropriate.

      The foregoing does not constitute a waiver of any claims or causes of action at law or in equity.  In the event you are represented by counsel or retain an attorney to represent you in connection with this matter please forward this letter and ask him/her to contact me.

Sincerely,

Jerald B. Serviss

April 2, 2001


Jerald B. Serviss, Esq.
11911 San Vicente Boulevard, Suite 355
Los Angeles, CA 90049

Dear Jerry:

I acknowledge your letter dated March 29, 2001. Enclosed
is a check for $100 for the April 15 payment. The balance is
$1,700.

I realize that we did not agree on the terms of the promissory
note. You asked me to send you one and I responded as
quickly as possible.

Since your are an attorney, I am well aware that you feel the
need to take legal recourse if the need should arise. I
acknowledge that you will not be at rest until this matter is
past us and you must seek legal action if I do not respond.
Please note that I will make good on the promissory note
and that I also wish to get this situation resolved as quickly
as possible. In return, I must ask you to no longer contact
me by phone and/or request that you meet with me. Thank
you for your consideration in this matter.

Sincerely,

Nanette A. Macdonald

Enclosure (Check no. 6680)

# Nanette Macdonald (RA) CRS

**Date: February 21, 2001**

_Number of pages including cover sheet: 2_

**TO :** Jerald B. Serviss, Esq.

**FROM:**   Nanette Macdonald
                    _(RA) CRS_

_Coldwell Banker Pacific_
_Properties_
_4211 Waialae Avenue_
_Suite 104_

**Phone : (310) 472-6250**

**Fax Phone : (310) 471-1686**

**Phone**   (808) 732-1414

**Voicemail**   (808) 739-3790 ext. 232

**Fax Phone**   (808) 732-0914

**CC:**

| **REMARKS:** | ☐ Urgent | ☒ For your review | ☐ Reply ASAP | ☐ Please Comment |
|---|---|---|---|---|

Jerry,

Attached is the promissory note.

Nan Macdonald

# PROMISSORY NOTE

On this date, February 21, 2001, Nanette A. Macdonald, promises to pay Jerald B. Serviss, Esq., the amount of $6,300 (six thousand three hundred and no/100). The amount shall be paid in full by August 31, 2001. No interest shall accrue on this note.

NANETTE A. MACDONALD
P. O. Box 314
Honolulu, HI 96809-0314